No. 26,878.

JOHN DUNCAN, *Appellant*, v. U. G. CLARY, J. T. MACON and JOHN BAPTIST, County Commissioners of the County of Bourbon, *Appellees* (THE ROAD SUPPLY AND METAL COMPANY, Intervener, *Appellant*), and DENNIS J. DOWNEY, Intervener.

SYLLABUS BY THE COURT.

1. BUILDING AND CONSTRUCTION CONTRACTS—*Lien on Machinery and Equipment for Default by Contractor — Rights of Purchaser with Notice.* A board of county commissioners entered into a contract for the construction of a road, which provided that if the contractor failed to carry out its provisions the board was authorized to take over the completion of the contract and also the equipment and material on the project and use the same in completing the contract in accordance with its provisions. Default was made by the contractor, and after due notice the equipment and machinery in use on the project were taken over by the board and used in the completion of the project. The agent who was superintending the work which had been partly done, and was acquainted with the provisions of the contract, claimed to have purchased the machinery and equipment and to be the owner thereof, and he brought an action of conversion against the board asking the recovery of the value of the property which the board had taken over and used. *Held,* that the contract was a valid one, that it gave the board a contractual lien on the machinery and equipment which was enforceable in equity not only against the contractor but also against his agent who purchased the property with notice of the contract provisions.

2. SAME — *Purchaser with Knowledge Takes Subject to Contractual Lien.* Machinery and equipment sold to the contractor after the contract was executed, knowing that it was to be used on the project, is subject to the contractual lien.

3. SAME—*Contractual Lien—Ownership of Equipment—Evidence.* The evidence is examined and held to be sufficient to support a finding that the furnishing of machinery and equipment by a party after the contract was made was a sale of the same rather than a rental transaction.

Highways, 29 C. J. p. 610 n. 17. Liens, 37 C. J. pp. 316 n. 78, 317 n. 80. Sales, 35 Cyc. p. 28 n. 20.

Duncan v. Clary.

Appeal from Bourbon district court; Edward C. Gates, judge. Opinion filed March 12, 1927. Affirmed.

*Thomas E. Wagstaff, Jay W. Scovel* and *Donald W. Stewart,* all of Independence, for the appellant; *A. M. Keene,* of Fort Scott, and *C. A. Lienbach,* of Onaga, for intervener The Road Supply and Metal Company.

*Ernest E. Blincoe,* county attorney, for the appellees; *Harry Warren,* of Fort Scott, of counsel.

The opinion of the court was delivered by

Johnston, C. J.: John Duncan brought this action against the board of county commissioners of Bourbon county, alleging that they had wrongfully and maliciously taken possession of certain road machinery and equipment, property belonging to plaintiff, of the value of $23,235.50, and had converted it to their own use, and he prayed for the value of the property and also for damages. The Road Supply and Metal Company later intervened in the action claiming to be the owner of part of the property taken and used by the commissioners, and it asked judgment for the value of the same in the amount of $13,197. The case was tried by the court without a jury and judgment was given in favor of the board of county commissioners of Bourbon county against both the plaintiff and the intervener, from which they appeal.

In June, 1921, the board of county commissioners, after proper preliminary proceedings, duly ordered the improvement of three sections of highways within the county, and application was made for federal aid for each project, which was granted, and the roads were incorporated into the state system of highways. Advertisements for bids were duly made for the improvement of these roads, and when the bids came in those made by Frank Bechtelheimer were found to be the lowest, and the three contracts were awarded to him. Formal contracts were prepared and signed, which were of the standard form used in federal-aid projects. The contracts provided among other things when the work should be commenced, when completed, that the contractor should provide sufficient workmen and equipment and materials to insure the carrying on and completion of the work, and that if the work was unsuitable and it was rejected the contractor was required to remove it and remake the road in accordance with the contract, and that if he failed in these respects, or if he became insolvent, or allowed a final judgment against him

to remain unsatisfied for 48 hours, or if he should make an assignment for the benefit of creditors:

". . . or from any other cause whatsoever shall not carry on the work in an acceptable manner, the engineer shall give notice in writing to the contractor and his surety of such delay, neglect or default, specifying the same, and if the contractor, within a period of ten (10) days after such notice, shall not proceed in accordance therewith, then the board shall, upon written certificate from the engineer of the fact of such delay, neglect or default, and the contractor's failure to comply with such notice, have full power and authority, without violating the contract, to take the prosecution of the work out of the hands of the contractor, appropriate or use any or all materials and equipment on the ground as may be suitable and acceptable, and may enter into an agreement for the completion of said contract according to the terms and provisions thereof, or use such other methods as in his opinion shall be required for the completion of said contract in an acceptable manner. All costs and charges incurred by the board, together with the costs of completing the work under contract, shall be deducted from any moneys due or which may become due said contractor. In case the expense so incurred by the board shall be less than the sums which would have been payable under the contract if it had been completed by said contractor, then the said contractor shall be entitled to receive the difference, and in case such expense shall exceed the sum which would have been payable under the contract, then the contractor and the surety shall be liable to pay the county the amount of said excess."

The contractor listed the machinery and equipment owned by him which he was to devote to the building of the road. Shortly after the execution of the contract, the machinery and other equipment was shipped to Bourbon county and work upon the different projects was begun. John Duncan, the plaintiff, came to Bourbon county as an employee and agent of Bechtelheimer, and exercised general supervision of the work, including the payment of expenses incurred. He became the general superintendent of construction upon each of the road projects, and had in his possession the plans and specifications which constituted a part of each contract and which contained the essential provisions of the contract involved in this litigation. He continued in that capacity until May, 1922, but defaults were made in the progress of the work, which resulted in the service of a notice upon the contractor and The Globe Indemnity Company, which was a surety on the contractor's obligations. Before the lapse of the time fixed by notice the contractor undertook to correct the causes of his default by making an arrangement with certain Kansas City interests to finance the projects, and at that time one Paul McGeehan took charge of the construction of said projects and of

the equipment upon them. His control continued until July, 1922, at which time defaults continued and work upon the projects had practically ceased. A second notice of default upon the contractor and the indemnity company was given by the board, and after the lapse of time specified in the notice the cause of default had not been corrected, and the board on August 7, 1922, in accordance with the provisions of the contract, took possession of all the equipment located on the projects necessary to complete them, and proceeded with the construction of the roads, after adopting proper resolutions to that end. About August 14, 1922, John Duncan made demand on the appellees for the equipment which had been taken over by the board, claiming to own the same under a bill of sale of date April 10, 1922, asserting that he was the owner of the property taken over. It was alleged that prior thereto a bank had a mortgage on the property from Bechtelheimer, that the bank foreclosed its mortgage and sold the property to Duncan after the foreclosure. It appears that before the work was completed The Globe Indemnity Company brought an action in the federal court in which Duncan and The Road Supply and Metal Company, among others, were made parties. In that action a receiver was appointed, who took constructive possession of the property under the order of that court, but the receiver, finding the board in the possession of the property, arranged with it that the county should continue to use the property for the completion of the three projects. After the completion of the roads the receiver sold the property and reported his action to the federal court.

Duncan contended that the testimony clearly established his title to the property taken over by the board, that he acquired it from the bank which had a lien thereon and had possession of it before the default occurred, and that the board could not take the possession of property other than that owned and possessed by the contractor, and argues that it could not enforce its charge or lien upon property owned by third persons, and that he was a third party so far as the contracts between the board and the contractor were concerned.

In respect to the claim of The Road Supply and Metal Company, there was a claim by it that it had furnished machinery and equipment for the purpose of building these roads upon a rental proposition, the contractor to pay ten cents a cubic yard of earth moved

in the construction of the roads, and $4 for each cubic yard of concrete mixed and poured in the construction. The agreements were committed to writing and specified that the contractor should keep the machinery in repair, but that the company should furnish all repair parts, except those broken or destroyed by accidents or carelessness. The machinery and equipment provided under this contract was billed to the contractor at the retail prices and during the use of the machinery and equipment no measurements were made of the amount of earth moved or of the concrete poured. Much testimony was offered on the proposition whether the material was sold to the contractor or only rented to him for use. In providing the machinery and equipment, The Road Supply and Metal Company had full knowledge of the road projects and of the contracts under which the work was to be carried on and whereon the machinery and equipment procured was to be used.

In behalf of Duncan it is contended that whatever rights the board may have had against the contractor, it could not acquire a lien or assert a right to property owned by others merely because it happened to be placed on or used in the construction of the roads. The rights of the company arose under the contract, and a charge upon designated property was created by the contract. Strictly speaking, it is not a lien, but it is a charge and such a hypothecation of the property as may be equitably enforced. (3 Pomeroy's Equity Jurisprudence, 4th ed. § 1234.) Duncan, who was superintendent of construction, had charge of the materials, machinery and equipment brought upon the road, as well as the payment of expenses, and had in his possession the plans, specifications and contracts, and of course knew of the provision that upon default in carrying out the contract the board had the right to take over such equipment and material used on the work as was acceptable and appropriate and use it in the completion of the contract. Assuming that he purchased and was the owner of some of the property, he brought it upon the work and devoted it to the performance of the contract with full knowledge that the specific charge and hypothecation might be enforced against the property in the event of a default. The chattel mortgage, which was executed on October 24, 1921, upon the equipment held by a bank from which Duncan claims to have purchased it, recited that the property was located in Bourbon county on the road projects mentioned, so that the bank had knowledge of the

Duncan v. Clary.

use to which the property was to be devoted and was required to take notice of the charge against it under the contract, and of course Duncan acquired no greater rights than the bank had, and besides, he had abundant notice from his possession of the contract. He did not purchase the property until April 10, 1922, which was long after the work was in progress under his supervision. If notice was necessary, he is not in position to claim that he was without notice of the rights of the board to use the equipment and material in completing the work under the defaulted contract. He made no claim to the board of ownership of the equipment when his purchase was made, but continued the work for some time thereafter as he had before, and did not assert any right until after the board took possession of the property on August 7, 1922. As to the right of the board to take possession under the provision of the contract stated, there can be little question. The provision was binding not only on the contractor, but also upon all claimants who had notice of the contract right to use the property upon the projects.

"The doctrine may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or encumbrancers with notice. . . ." (3 Pomeroy's Equity Jurisprudence, 4th ed., § 1235.)

A somewhat similar contract was considered in *Duplan Silk Co. v. Spencer,* 53 C. C. A. 321. There a contractor entered into an agreement with an owner to build a mill which contained a provision that the owner in case of a default by the contractor might proceed to finish the building, and to that end might use material and tools brought upon the premises by the contractor for the purpose of erecting the building. Default was made and the owner took possession of the tools and material upon the ground. The contractor was declared bankrupt and the trustee of the bankrupt estate brought an action of trover against the owner. Speaking of such contracts it was held that the taking of possession by the owner could not be regarded as steps to enforce a forfeiture. That it simply provided a method by which the owner of premises en-

forced a general security given him upon material brought on the ground by the contractor. It was said:

"In this, we discover no features of a technical forfeiture. The strictness with which it is sometimes said that a contract involving forfeiture must be construed, is not applicable here. The stipulation is to be neither strictly nor loosely construed, but must be dealt with so as to fairly effect the meaning of the parties, as expressed by the language they have used in their contract. . . . A quasi or qualified right of property in these materials by the owner of the soil, and a possession not inconsistent with the builder's right and duty to incorporate them in the building, would thus result from their delivery by the contractor on the premises, and their appropriation to the construction of the building. . . . The general contract as to this matter must be taken to mean something, and it would be of little avail to say that the plaintiff in error can take the steps prescribed in article 5 to make this security available if the materials themselves could be taken away, as claimed by defendant in error, by the execution of a creditor or the action of a trustee in bankruptcy." (p. 325.)

It was held that property so brought upon the premises by the contractor was sufficiently in his possession to protect the charge or lien against the specific property. It was said:

"Materials delivered as in this case, are notoriously to all the world, in the qualified possession and ownership of the owner of the freehold, and the creation of a lien or charge, or the making of a conveyance, would not require, or indeed be susceptible of, any further delivery or change of possession, in order to take the case out of the mischiefs of the statute of frauds." (p. 327. See, also, *In re Shelly,* 55 C. C. A. 91; *Houselt v. Harrison,* 105 U. S. 401; *Wilds v. Board of Education,* 227 N. Y. 211.)

In regard to the claim of the intervener, The Road Supply and Metal Company, the principal question involved was whether the property had been sold to the contractor or only rented to him for use in the projects. It had full knowledge that the machinery and equipment furnished to the contractor was to be used by Bechtelheimer under his contract with the board. A written memoranda of agreement was executed by the parties which in terms was a rental of the property instead of a sale. It appears, however, that the property was billed to the contractor at the regular retail prices of the articles furnished to him. The agent and salesman of the intervener stated that he sold equipment to the contractor; and further, that his company was familiar with the contract made and knew that it provided that the machinery and equipment on the work was to stand as a guaranty of the work under the contract. He stated that he was interested and helped Bechtelheimer to secure the contract and had dealings with the board, but he had never advised

Duncan v. Clary.

it that his company was an owner of the property delivered to the contractor. Although the intervener claimed that it was renting the property furnished on the basis of the quantity of earth removed and of the concrete mixed and poured, it at no time measured the quantities removed or poured. In making a return to the federal government as to the business done by the company, it only made returns of earnings from sales, and none were made from rentals. In a letter to the contractor the manager of the company explained why the company was obliged to charge the prices named in the invoices of machinery, which was in fact the selling price, and he further stated that he realized that the price was greater than the contractor expected to be charged, but that the company could not furnish the articles for less. There were a number of other statements and circumstances which plainly tended to show that the property was sold to be used on the projects, and the finding of the court that it was a sale and not a rental was abundantly supported by the evidence.

There is a further argument that the charge could not attach or bind subsequently acquired property or property not yet in existence. The lien arising under the contract is not only enforceable against the contractor, but also others that had notice thereof. Judge Story said:

"The doctrine is carried still further, and applied to property not yet in being at the time when the contract is made. It is well settled that an agreement to charge, or to assign, or to give security upon, or to affect property not yet in existence, or in the ownership of the party making the contract, or property to be acquired by him in the future, although, with the exception of one particular species of things, it creates no legal estate or interest in the things when they afterwards come into existence or are acquired by the promisor, does constitute an equitable lien upon the property so existing or acquired at a subsequent time, which is enforced in the same manner and against the same parties as a lien upon specific things existing and owned by the contracting party at the date of the contract." (3 Pomeroy's Equity Jurisprudence, 4th ed., § 1236.)

The appellant cites *Titusville Iron Co. v. City of New York,* 207 N. Y. 203, wherein it was held that an attempt to create a chattel mortgage on property by one who did not own it did not result in a lien, but even in that case it was held that "mortgages or contracts pledging subsequently acquired property, though void at law, will nevertheless be enforced in equity as between mortgagor and mortgagee, as agreements to give liens and also as against purchasers with notice." Other cases are cited by appellant as au-

thorities against the enforcement of the contract, but an examination of them shows that they are based on a different state of facts than are presented in the present case. The contract made was a valid one and the contract liens were enforceable as against both the plaintiff and the intervener. The situation as to these parties was not affected by the proceeding in the federal court, as the receiver in that proceeding permitted the use of the property under the contract until the work was completed.

The judgment is affirmed.